**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:15-CV-00032-RLV-DSC**

| | | |
|---|---|---|
| **JOHN CURTIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **CAFÉ ENTERPRISES, INC. d/b/a FATZ** | ) | |
| **CAFÉ, f/k/a FATZ CAFÉ, INC. (a North** | ) | |
| **Carolina Corporation),** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**BEFORE THE COURT** is Defendant Café Enterprises, Inc.'s Motion for Summary Judgment and accompanying brief in support. [Doc. 18, 19]. Plaintiff John Curtis filed a response [Doc. 23] to which Defendant replied [Doc. 27].

**I.    PROCEDURAL HISTORY**

On January 16, 2015, Plaintiff filed suit against Defendant in the Superior Court of Lincoln County, North Carolina. [Doc. 1-1] at 6. On February 25, 2015, Defendant removed the action to this Court, asserting diversity jurisdiction. [Doc. 1]; *see also* 28 U.S.C. § 1332. On the same day, Defendant filed a motion for an extension of time to respond [Doc. 2], which was granted on February 26, 2015. [Doc. 3]. Defendant filed an answer to Plaintiff's complaint on March 23, 2015. [Doc. 5].

On August 1, 2016, Defendant filed a motion for summary judgment (the" Motion") and an accompanying brief in support. [Doc. 18, 19]. On September 2, 2016, Plaintiff filed a response in opposition to the Motion. [Doc. 22]. On September 6, 2016, Plaintiff filed a motion to amend its response in opposition to the Motion and an amended response in opposition to the Motion,

[Doc. 23], which was granted on September 7, 2016. [Doc. 24]. On September 9, 2016, Defendant filed a reply memorandum in support of its Motion. [Doc. 27].

## II.    JURISDICTION AND VENUE

Plaintiff is a citizen and resident of Lincoln County, North Carolina. [Doc. 1-1] at 7. Defendant is a South Carolina corporation with a principal place of business in South Carolina. [Doc. 1 at 2]. Defendant, which is licensed to do business under the laws of North Carolina, conducts business in Lincoln County, North Carolina. [Doc. 1-1] at 7. Defendant does business as "Fatz Café," and is the successor in interest to "Fatz Café, Inc," which is or was a North Carolina corporation. *Id.* Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs. *Id.* Because complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

This action was removed from the Superior Court of Lincoln County, North Carolina, which is within this Court's district and division. Therefore, venue is appropriate in this division.

## III.    STATEMENT OF FACTS

Defendant hired Plaintiff as a "Service Manager" for Fatz Café in Lincolnton, North Carolina in June of 2010. [Doc. 1-1] at 7; [Doc. 5] at 1. Plaintiff was promoted to "General Manager" later that same year. [Doc. 1-1] at 7–8; [Doc. 19] at 2. On or about June 27, 2011, Plaintiff and Defendant entered into a written "Operating Partner and Employment Agreement" (the "Agreement"), designating Plaintiff as "Operating Partner" and Defendant as "Corporation." [Doc. 19-1] at 2. In pertinent part, the Agreement states:

> [F]or and in consideration of the foregoing recitals, the payment of Twenty-Five Thousand and No/100 Dollars ($25,000.00) to the Corporation by the Operating Partner (the "Operating Partner Payment"), the continued employment and employment for a term of Operating Partner by the Corporation in the position of

General Manager of the Restaurant, the promises, covenants, terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

. . .

2.     <u>Term</u>. The term of the Agreement will commence on [June 27, 2011] and will continue until the fifth (5th) anniversary thereof (the "Termination Date"), unless earlier terminated in accordance with <u>Section 12</u>.

. . .

4.     <u>Comprehensive Compensation</u>.

. . .

(a)     <u>Base Compensation</u>. The Corporation will pay a gross salary as determined from time to time by the Corporation ("Base Compensation"); provided, however, the Operating Partner's annualed Base Compensation during the time during which the Operating Partner is employed under this Agreement will not be less than Fifty-Two Thousand and No/100 Dollars ($52,000.00) payable in equal weekly installments on the Corporation's regular pay days.

. . .

(c)     <u>Incentive Amounts</u>. The Corporation will pay, pursuant to Subsection 4(d) below and less any federal, state and local withholding requirements, a monthly amount (as adjusted, the "Incentive Amount") equal to: (i) four percent (4.0%) of each month's Profit After Controllables (as defined below) for the Restaurant if Profit After Controllables for the Restaurant is greater than or equal to eighteen percent (18%) but less than twenty percent (20%) . . . Notwithstanding the foregoing, the Corporation will not pay, and the Operating Partner will not be entitled to, any such Incentive Amount for months during which the Profit after Controllables for the Restaurant after the deduction of the Incentive Amount is not greater than or equal to eighteen percent (18%) of Total Net Sales for the Restaurant. "Profit After Controllables" means, with respect to the Restaurant for a given time period, an amount equal to the Restaurant's total net sales (including food, beverage and alcoholic beverage sales) ("Total Net Sales") <u>plus</u> other Restaurant income <u>less</u> the cost of goods sold, <u>less</u> payroll and benefits expenses, <u>less</u> unit controllables and <u>less</u> other controllables, each as determined by the Corporation in its sole discretion; provided, however, that the foregoing method of determining Profit After Controllables is subject to revision by the Corporation in its reasonable discretion to reflect the profitability of the Restaurant to the extent such profitability is within the control of the Operating Partner.

. . .

(d)  <u>Profit After Controllables and Total Net Sales</u>. For purposes of this Agreement, Profit After Controllables for the Restaurant and Total Net Sales for the Restaurant will be determined by the Corporation as reported in the Corporation's final monthly and annual operating statements as prepared by the Corporation's accounting department and distributed to management. Any dispute between the Corporation and Operating Partner will be finally determined by the Corporation's accountants, whose determination will be conclusive. Profit After Controllables will include the then paid and incurred Incentive Amount as calculated for that period.

. . .

(f)  <u>No interest in the Corporation</u>. The Operating Partner hereby acknowledges that the Incentive Amount in Subsection 4(b) above does not constitute an ownership interest of any kind in the Corporation or any specific assets of the Corporation.

. . .

12.  <u>Termination</u>.

(a) <u>Mutual Consent</u>. The Operating Partner's employment and this Agreement may be terminated by the mutual written agreement of the Operating Partner and the Corporation. The Corporation's Base Compensation and Incentive Amount obligations under <u>Section 4</u> above will cease as of the effective date of the parties' agreement to terminate, unless otherwise agreed in writing.

. . .

(c) <u>Termination by the Corporation for Cause</u>. The Operating Partner's employment and this Agreement will terminate immediately upon the existence of Cause, defined as the Corporation's reasonable belief of:

. . .

      ii.  Any commission of fraud by Operating Partner (including, without limitation, "padding" the payroll, allowing unauthorized complimentary meals and altering actual inventory levels, and the like);

      iii.  Any dishonesty by the Operating Partner in Operating Partner's dealings with the Corporation or its customers, negligence in the performance of the duties of Operating Partner, willful misconduct, or the conviction (or plea of guilty or *nolo contendere*) of Operating

Partner of any felony or any other crime involving dishonesty or moral turpitude;

. . .

Should the Operating Partner dispute whether s/he was terminated for Cause, then the Corporation and the Operating Partner will enter immediately into binding arbitration pursuant to the Taylors, SC Arbitration Rules of the American Arbitration Association in, South Carolina, the cost of which will be borne by the non-prevailing party.

. . .

18.     Governing Law. This Agreement will in all respects be subject to, and governed by, the laws of the State of South Carolina, without reference to choice of law rules.

. . .

22.     Amendments. This Agreement may be amended at any time by mutual consent of the parties hereto, with any such amendment to be invalid unless in writing, signed by the Corporation and the Operating Partner.

[Doc. 19-1] at 2–12.

On or about April 24, 2012, The Agreement between Plaintiff and Defendant was amended by replacing Section 13(b)(i), Section 13(b)(ii), Section 13(c), and Section 14(a), none of which have any bearing on the present case. [Doc. 19-2].

When short staffed with Managers to assist in running and managing shifts, Operating Partners were allowed to use hourly employees for "shift management," or as a "shift leader," or in "key hourly" positions. [Doc. 1-1] at 11–13; [Doc. 5] at 3–4. During such times, Plaintiff used an hourly employee named Katrina Russell to perform managerial duties, and she clocked in under administrative hours. [Doc. 1-1] at 13–14; [Doc. 5] at 4–5; [Doc. 19] at 5. When Defendant scheduled a managers' meeting in Columbia, South Carolina, Plaintiff communicated to Defendant that Ms. Russell did not want to travel to the meeting. [Doc. 1-1] at 14; [Doc. 5] at 4.

On August 6, 2014, Defendant gave Plaintiff a "Performance Improvement Plan," which outlined concerns about Plaintiff's performance. [Doc. 19-9]. In the document, Defendant stated, "I am following this up today with written documentation because the trend continued through July. This is a 30 day notice from myself that if improvement is not seen we will be going to a 30 day notification of your Operating Partner Agreement." *Id.* at 4. The document also requested an Action Plan from Plaintiff by August 10, 2014, and was signed by Plaintiff. *Id.* Plaintiff submitted a "30 Day Action PLAN" on August 10, 2014, in which he stated, "I John Curtis promise to Café Enterprises and everyone around me who depends on me to be successful and I will work harder than ever before and make all of the needed adjustments over the next 30 days so as to not have to have this conversation with anybody else." [Doc. 19-11] at 4.

On or about September 1, 2014, Defendant instructed Plaintiff to reduce administrative hours. [Doc. 1-1] at 14; [Doc. 5] at 5. On September 8, 2014, Plaintiff e-mailed his Area Partner stating, "Admin Hours- 70.17 (I have yet to speak with Sharon and Katrina about this as to them clocking in differently. This [sic] will not be this many next week. Only the few we talked about for Sharon on Office Time.)." [Doc. 19-13] at 2.

On or about September 16, 2014, Defendant gave Plaintiff notice of his discharge. [Doc. 23-17]; [Doc. 1-1] at 10; [Doc. 5] at 5. Defendant gave Plaintiff the opportunity to resign immediately (immediate termination "for-cause") or to work two additional weeks. [Doc. 1-1] at 15; [Doc. 5] at 5; [Doc. 23-2] at 7; [Doc. 27] at 3. Plaintiff chose the latter option, and Plaintiff and Defendant entered into a mutually consented termination agreement ("Mutual Termination Agreement") pursuant to Section 12(a), titled "Mutual Consent," of the Agreement. [Doc. 23-17]; [Doc. 1-1] at 10; [Doc. 5] at 5. The Mutual Termination Agreement states that Plaintiff "was given the direction by his Area Partner (Gary Tate) to remove Administrative hours from his weekly

labor expense," and that "[i]nstead of removing the hours[,] [Plaintiff] simply changed the job code to shift leader; leaving the associate with the same job description and pay rate she had as an Admin/Key Hourly." [Doc. 23-17] at 1. Pursuant to the Mutual Termination Agreement, Plaintiff worked through the end of September 2014. [Doc. 23-17] at 1; [Doc. 1-1] at 10; [Doc. 5] at 5.

## IV.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *accord. Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).

It is well-established that the mere existence of "some" factual disputes will not defeat summary judgment; rather, the dispute presented must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247-248 (emphasis in original); *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Only disputes over facts that might affect the outcome of the suit under relevant governing law fall within the relevant category. *See Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 374 (4th Cir. 2012). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Abstract or conjectural doubts, minor discrepancies, and points irrelevant to the "material" facts are not genuine or material, and such do not cast sufficient doubt on the validity of testimony to preclude the entry of summary judgment. *Emmett*, 532 F.3d at 297; *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). The non-movant cannot demonstrate a triable issue of disputed fact by building one inference upon another. *Emmett*, 532 F.3d at 297 (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Although it is certainly true that "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party," *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (en banc), it is equally true that a court is "well within its discretion in refusing to ferret out the facts that counsel has not bothered to excavate." *Cray Commc'ns. Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994). Mere conjecture and speculation, however, are insufficient to overcome a summary judgment motion. *See Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384, 1386 (4th Cir. 1987); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241-46 (4th Cir. 1982); *accord Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

Because a federally protected right to "just cause" protection does not exist with regard to private sector employment, a plaintiff is not entitled to relief simply because he disagrees with his employer's employment decisions, or because he contends that a particular decision was arbitrary or baseless. *See Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 523 (W.D.N.C. 2015) (Voorhees, J.). Instead, to prevail, a plaintiff must generally demonstrate that his private employer's adverse decision resulted from "some sort of . . . prohibited discriminatory animus," violated some federal statutory right, or violated a similar (or broader) state law right. *See id.* In North Carolina, "absent an employment contract for a definite period of time, both employer and employee are generally free to terminate their association at any time and without reason." *Head v. Adams Farm Living,*

*Inc.*, 775 S.E.2d 904, 909, 2015 N.C. App. LEXIS 705 (N.C. Ct. App. 2015). The Court's review of this matter must be guided by these principles.

## V.     APPLICABLE STATE LAW

It is well-settled that a "[f]ederal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of law rules." *Volvo Constr. Equip. North America, Inc. v. CLM Equip. Co., Inc.,* 386 F.3d 581, 599–600 (4th Cir.2004) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The Court, accordingly, must apply the choice-of-law rules for the State of North Carolina as announced by the North Carolina Supreme Court. *Brendle v. General Tire & Rubber Co.,* 505 F.2d 243, 245 (4th Cir.1974).

North Carolina courts generally recognize the validity and enforceability of contractual choice of law provisions, and the Court will accordingly apply South Carolina contract law where appropriate. *See Mosteller Mansion, LLC v. Mactec Eng'g & Consulting of Georgia, Inc.*, 190 N.C. App. 674, 661 S.E.2d 788 (2008). With regard to torts, the North Carolina Supreme Court "has consistently adhered to the *lex loci* [*delicti*] rule in tort actions," *Boudreau v. Baughman,* 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988), which dictates that the law of the state of the situs of the claim governs the case. *Id. Lex loci delicti,* which is defined as "the law of the place where the tort was committed," *Black's Law Dictionary* (10th ed. 2014), is also known as "the law of the place of the wrong." *Brendle v. General Tire & Rubber Co.,* 408 F.2d 116, 117 n. 3 (4th Cir.1969). Therefore, the Court will apply North Carolina tort law where appropriate.

## VI.    CLAIMS PRESENTED AND ANALYSIS

### A.    Count I: Breach of Contract

Plaintiff alleges that after contractually altering the general rule of employment-at-will by entering into the Agreement, Defendant "failed to implement and enforce an effective standard of honesty and integrity in accounting for Defendants' own employees and management staff, and abused its discretion and/or failed to act in good faith regarding the calculation of 'controllables[,]' menu items, store credits and timekeeping classifications, wrongfully terminated Plaintiff's employment, and by so doing breached the Agreement both directly and in violation of the term of Good Faith and Fair Dealing implicit in every contract." [Doc. 1-1] at 17. Plaintiff further alleges that Defendant participated in, condoned, or ratified these unlawful behaviors, and that Defendant's commission or omission of these acts "violated the express and/or implied undertakings contained in the Agreement." *Id.* In his memorandum of law in response to Defendant's Motion, Plaintiff argues that the "mutuality" of the Mutual Termination Agreement is a genuinely challenged material fact, and suggests that the execution of the Mutual Termination Agreement "smacks of undue influence, coercion, duress, and unfair dealing." [Doc. 23-2] at 14. Plaintiff then outlines an argument that the Mutual Termination Agreement and the unexecuted notice of immediate termination for cause were void for lack of consideration, fraud, and duress. *Id.* at 15–19.

Defendant argues that Plaintiff cannot establish that Defendant breached the Agreement by entering into the Mutual Termination Agreement; that the termination "was not wrongful and was not grossly unfair;" that Defendant could have terminated Plaintiff for-cause immediately, but Plaintiff chose mutual termination; and that if Plaintiff had been terminated for cause and he disputed the cause, he would have been required to enter immediately into binding arbitration

pursuant to the Agreement. [Doc. 19] at 8–9. Defendant also argues that Plaintiff is estopped from disregarding the Mutual Termination Agreement and asserting rights under the Agreement under the doctrine of quasi-estoppel, and that due to Defendant's right to terminate Plaintiff without cause after 30-days' notice, any damages owed to Plaintiff are necessarily limited. *Id.* at 10-11. Lastly, Defendant argues that Plaintiff cannot establish that Defendant breached any terms of the Agreement or violated the implied covenants of good faith and fair dealing. *Id.* at 11–13.

Ultimately, this cause of action turns on contract interpretation, and the Court applies South Carolina contract law pursuant to the choice of law provision in the Agreement. The parties do not dispute the legitimacy or enforceability of the Agreement as it relates to the alleged breach of contract. Section 12 of the Agreement plainly outlines the parties' respective rights to terminate the Agreement. [Doc 19-1] at 7. Section 12(a) specifically authorizes the termination of the Agreement "mutual written agreement of the Operating Partner and the Corporation." *Id.* Both Plaintiff and Defendant agree that the Mutual Termination Agreement was executed on September 16, 2014, ([Doc. 23-17]; [Doc. 1-1] at 10; [Doc. 5] at 5), but Plaintiff argues that the Agreement was not mutual. [Doc. 23-2] at 14.

Plaintiff's argument that the Mutual Termination Agreement lacked consideration fails to defeat summary judgment. The parties do not dispute that Defendant gave Plaintiff a choice between immediate termination for cause and the Mutual Termination Agreement, which offered Plaintiff the benefit of two weeks of additional work and pay up to and including September 29, 2014, two additional weeks of pay after September 29, 2014, and the August and September bonus. [Doc. 1-1] at 15; [Doc. 5] at 5; [Doc. 23-2] at 7; [Doc. 27] at 3; [Doc. 23-17] at 1. The parties do not dispute that after executing the Mutual Termination Agreement, Plaintiff received and accepted the four additional weeks of pay. [Doc. 23-7] at 205; [Doc. 27] at 5; [Doc. 23] at 9. In fact, Plaintiff

admits that he signed the Mutual Termination Agreement because he has "a family to support, and [he] was looking at the fact that [he] was at least getting four more weeks out of the deal," which indicates he contemplated and chose the offered benefits. [Doc. 23-7] at 252–253; [Doc. 23-2] at 7–8. In applying South Carolina law, "[t]he Fourth Circuit has held that under the doctrine of quasi-estoppel, a party cannot accept or retain the benefits of a transaction . . . and take a position inconsistent therewith." *BCD, LLC v. BMW Mfg. Co., LLC*, No. 6:05-CV-2152-GRA, 2008 WL 304878, at *16 (D.S.C. Jan. 31, 2008), *argued* and *aff'd*, 360 F. App'x 428 (4th Cir. 2010) (citing *In re Robb*, 23 F.3d 895, 898-899 (4th Cir.1994)). Plaintiff ratified the Mutual Termination Agreement by accepting the benefits from the transaction, and is estopped from disclaiming the Mutual Termination Agreement as a matter of law.

Plaintiff's allegation that the Mutual Termination Agreement is void due to fraud also fails to defeat summary judgment. It is irrelevant and immaterial whether Defendant decided to terminate the Agreement before (as argued in Plaintiff's response in opposition to the Motion) or during the September 16, 2014 meeting. Parties are always permitted to voluntarily terminate a contract before the end of the term. *Moody v. McLellan*, 295 S.C. 157, 161, 367 S.E.2d 449, 451 (Ct. App. 1988) (citing *Young v. Minton,* 49 Ga.App. 545, 176 S.E. 662 (1934)). The only relevant fact is that the parties entered into the Mutual Termination Agreement, and that fact is undisputed.

Finally, Plaintiff's allegation of duress fails to preclude summary judgment. Plaintiff alleges he was "instructed to go to an office where three of Defendant's management team told him he could not leave until he signed one of the dual "Termination Agreements." [Doc. 23-2] at 16. Plaintiff suggests that this created pressure, which when coupled with the fact that he was presented with a choice between two written agreements that both ultimately resulted in the termination of his employment, placed him under duress sufficient to invalidate the Mutual

Termination Agreement. *Id.* at 15–17. Even though the Fourth Circuit has held that "[a] threat to enforce a legal right cannot constitute duress," *Negri v. Nw. Mut. Life Ins. Co.*, 165 F. App'x 247, 249 (4th Cir. 2006) (citing *Goode v. Burke Town Plaza, Inc.,* 246 Va. 407, 411, 436 S.E.2d 450, 452-53 (1993)), the Court must view the facts and reasonable inferences in the light most favorable to Plaintiff, and at this stage in the litigation, the Court will not discredit the allegation of duress. However, this factual dispute is immaterial.

As explained above, the doctrine of quasi-estoppel prohibits Plaintiff from accepting the benefits under the Mutual Termination Agreement and then taking an inconsistent position like alleging that the Mutual Termination Agreement is invalid due to duress. *See BCD, LLC v. BMW Mfg. Co., LLC* at *16. Furthermore, "[a] contract or release which is procured by duress is not void, but merely voidable and is capable of being ratified." *Hyman v. Ford Motor Co.*, 142 F. Supp. 2d 735, 748 (D.S.C. 2001). A party may ratify an agreement entered into under duress by "intentionally accepting benefits under the contract; by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; or by recognizing its validity by acting upon it, performing under it or affirmatively acknowledging it." *Id.* (citing *In Re Boston Shipyard Corp.,* 886 F.2d 451, 455 (1st Cir. 1989). By working for two additional weeks and receiving four weeks' pay, Plaintiff performed pursuant to the Mutual Termination Agreement and accepted the benefits of the transaction. Therefore, as a matter of law, Plaintiff's allegation of duress does not survive summary judgment.

Given that the Mutual Termination Agreement is not void pursuant to the challenges presented by Plaintiff or for any other reason, the Court discerns no breach of the Agreement on the part of Defendant by entering into the Mutual Termination Agreement.

Furthermore, Plaintiff hasn't presented evidence supporting his allegation that Defendant violated the covenant of good faith and fair dealing regarding the calculation of Plaintiff's Incentive Amount (as defined in the Agreement), and the allegation can be decided as a matter of law. The record shows that when Plaintiff was asked at deposition whether, after reviewing the documents produced by Defendant, he had evidence that the incentive pay was not calculated properly, he responded, "I don't know. I do not know." [Doc. 19-19] at 234. Additionally, the Agreement clearly states that such calculations are "determined by the [Defendant] in its sole discretion." [Doc. 19-1] at 4. The Agreement states that "[a]ny dispute between the [Defendant] and [Plaintiff] [regarding the calculation of Profit After Controllables and Total Net Sales] will be finally determined by [Defendant's] accountants, whose determination is conclusive." Because Plaintiff alleges lost wages that only relate as they might to the calculation of the Incentive Amount and the determination of Defendant's accountants is final and conclusive pursuant to the Agreement, the issue is decided as a matter of law and summary judgment is granted for Defendant.

The Court will not address Plaintiff's arguments that Defendant lacked cause to immediately terminate Plaintiff's employment because the parties entered into the Mutual Termination Agreement in lieu of immediate termination for cause. Even if Plaintiff had been immediately terminated for cause, the Agreement clearly requires Plaintiff to enter immediately into binding arbitration if he should dispute whether cause existed. [Doc. 19-1] at 8.

**B.**     Count II: Breach of Fiduciary Duty/Constructive Fraud

Plaintiff claims that Defendant held a position of trust and confidence and was a fiduciary with respect to Plaintiff. [Doc. 1-1] at 19. Plaintiff claims that Defendant was required to act in good faith and with due regard for plaintiff's interests, and that Defendant breached "Defendants' [sic] fiduciary duties to Plaintiff and caused Plaintiff to be subject to the deprivation of rights,

privileges, and/or immunities secured by the Agreement, the Defendant's written policies, law, and public policy." *Id.* at 19–20. Plaintiff also claims that Defendant used this position of trust and confidence to "fraudulently, arbitrarily, and capriciously miscalculate the 'controllables' and to artificially decrease the incentive payments to which Plaintiff was contractually entitled, and to bring about the termination of Plaintiff's employment and the Agreement." *Id.* at 20. Defendant effectively refutes Plaintiff's claim that a fiduciary relationship exists between an employer and employee, and argues that Plaintiff failed to meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure in his claim for constructive fraud. [Doc. 19] at 15–16.

The Court analyzes these tort claims pursuant to North Carolina law. Plaintiff alleges both a breach of fiduciary duty and constructive fraud. "Although the elements of these causes of action overlap, each is a separate claim under North Carolina law." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004). A breach of fiduciary duty requires a fiduciary relationship between the parties. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707–08 (2001) (citing *Curl v. Key,* 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984) and *Link v. Link,* 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971)). The relationship is such that "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other.*" *Id.* (quoting *Abbitt v. Gregory,* 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)).

The parameters of a fiduciary relationship have been specifically limited in the context of employment situations, and "the relation of employer and employee is not one of those regarded as confidential." *Id.* (quoting *King v. Atlantic Coast Line R.R. Co.,* 157 N.C. 44, 72 S.E. 801

(1911)); *see also Austin Maint. & Const., Inc. v. Crowder Const. Co.*, 224 N.C. App. 401, 742 S.E.2d 535 (2012). Here, Plaintiff gave $25,000.00 as consideration for the Agreement, which provided that incentive payments would be calculated by Defendant and paid to Plaintiff. The nature of these facts likely has some bearing on whether a fiduciary relationship existed between Plaintiff and Defendant; however, because Plaintiff did not cite to any evidence in the record to substantiate the breach, any dispute related to the existence of a fiduciary relationship or the breach thereof isn't genuine.

A cause of action for constructive fraud must allege "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *White*, 166 N.C. App. at 294, 603 S.E.2d at 156 (citing *Sterner v. Penn,* 159 N.C.App. 626, 631, 583 S.E.2d 670, 674 (2003)). To defeat a motion for summary judgment on a claim for constructive fraud, a plaintiff must show evidence of a "relation of trust and confidence ... [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 177–78, 684 S.E.2d 41, 53 (2009) (citing *Barger v. McCoy Hillard & Parks,* 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997)). "The basis of a claim for constructive fraud is the existence of a confidential or fiduciary relationship." *Id.* As previously discussed, Plaintiff did not cite to any evidence in the record to substantiate the claim that Defendant took advantage of its position of trust or thereby injured Plaintiff. Therefore, any potential issue related to the existence of a fiduciary relationship, which is the basis of a claim for constructive fraud, isn't genuine. Summary judgment is granted for both the claim of breach of fiduciary duty and the claim of constructive fraud.

**C.**     Count III: Wrongful Discharge

Plaintiff claims that Defendant discharged him in retaliation for Plaintiff's "proper reporting of an employee's mental health condition and related limitation, seeking a reasonable accommodation therefor (as required by federal law) and for reporting improper accounting practices in violation of the established public policy of the States of North and South Carolina." Plaintiff also claims that Defendant discharged him in violation of the Wage and Hour Acts of North and South Carolina, and that Plaintiff's discharge was in direct contraction to the Agreement and Defendant's policies and procedures. [Doc. 1-1] at 21–22. Plaintiff claims that he communicated to Defendant that Katrina Russell experienced anxiety issues related to traveling to Columbia, South Carolina for a scheduled Service Managers' Meeting, and that Defendant insisted that Katrina Russell attend the meeting. [Doc. 1-1] at 14. Plaintiff states that Katrina Russell did not attend the meeting and that Defendant instructed Plaintiff to demote her from the position of Service Manager. *Id.* Plaintiff also claims that he reported numerous improper accounting practices to Defendant, but that Defendant failed to adequately correct the issues. [Doc. 1-1] at 11–13.

Defendant argues that only "at-will" employees may claim wrongful discharge in violation of public policy, and Plaintiff's "at-will" status was altered by the Agreement. [Doc. 19] at 17. Furthermore, Defendant argues that Plaintiff wasn't discharged because he entered in the Mutual Termination Agreement. [Doc. 19] at 18. Defendant also argues that Plaintiff failed to identify with specificity the public policy Defendant allegedly violated, and Defendant disputes the allegation that it discharged Plaintiff for a retaliatory purpose. [Doc. 19] at 18–19. Defendant points out that Katrina Russell testified to voluntarily resigning from the Service Manager position and transferring to the non-managerial position. [Doc. 19-22] at 32–33, 62. Katrina Russell also testified that she actually spoke to Area Supervisor Gary Tate about her anxiety related to traveling

alone to the meeting in Columbia, South Carolina, and that Gary Tate said "Okay" and she didn't hear anything further about the issue. *Id.* at 62.

The Court analyzes these tort claims pursuant to North Carolina law. It is well settled that "[i]n North Carolina, absent an employment contract for a definite period of time, both employer and employee are generally free to terminate their association at any time and without reason. An exception to the employment-at-will doctrine exists when an employee is discharged in contravention of public policy." *Head v. Adams Farm Living, Inc.*, 775 S.E.2d 904, 909 (N.C. Ct. App. 2015). A claim for wrongful discharge only arises in the context of "at-will" employees. *Wagoner v. Elkin City Sch.'s Bd. of Educ.*, 113 N.C. App. 579, 588, 440 S.E.2d 119, 125 (1994).

The Court acknowledges the potentially disputed facts related to Katrina Russell's demotion and Plaintiff's alleged reports of improper accounting practices. However, those facts are immaterial because Defendant did not discharge Plaintiff. Here, Plaintiff and Defendant modified Plaintiff's "at-will" employment status by entering into the Agreement. The Agreement provided various termination options, to include mutual termination. As previously discussed in the analysis of Count I, Plaintiff and Defendant entered into the Mutual Termination Agreement, and agreed to terminate Plaintiff's employment. Therefore, Plaintiff was not discharged. Lastly, as also previously discussed, if Defendant had discharged Plaintiff for cause, the Agreement clearly requires Plaintiff to enter immediately into binding arbitration if he should dispute whether cause existed. [Doc. 19-1] at 8. Accordingly, summary judgment is granted for Defendant.

**D.** Count IV: Breach of Contract Accompanied by Fraudulent Acts

Plaintiff claims that the previously alleged breach of the Agreement was "accompanied by the fraudulent acts set forth herein in concealing or failing to disclose the existence or true nature and status of goods, services, expenses, costs, accounting methods and calculations, operating

philosophies, principles, policies, practices and procedures utilized by Defendant, and the proper compensation, including incentive payments due Plaintiff." [Doc. 1-1] at 23. Plaintiff then provides a list of Defendant's allegedly fraudulent statements and acts which Plaintiff claims to have relied upon to his detriment. *Id.* Defendant refutes the allegations and argues that, not only did Plaintiff fail to state the circumstances constituting fraud with particularity, but Plaintiff cannot establish a breach of contract. [Doc. 19] at 21. Defendant argues that without a breach of contract, Plaintiff cannot maintain a claim for breach of contract accompanied by a fraudulent act. *Id.*

North Carolina does not recognize a cause of action for breach of contract accompanied by fraudulent acts. *See Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992) (stating "a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract."). Because the Court applies North Carolina law to the tort claims in the present case, no cause of action exists for Plaintiff's claim.

Even if the Court could apply South Carolina law, Plaintiff's claim would not survive summary judgment. A claim for breach of contract accompanied by a fraudulent act "is not a claim separate and apart from one for breach of contract." *Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 202 (4th Cir. 1988) (citing *Smith v. Canal Ins. Co.*, 275 S.C. 256, 260, 269 S.E.2d 348, 350 (1980)). Proof that a breach of contract was accompanied by a fraudulent act is a predicate for recovering punitive damages. *Id.* Such a claim does not require proof of the same elements as a tort claim for fraud and deceit. *Edens*, 858 F.2d at 202 (citing *Harper v. Ethridge*, 290 S.C. 112, 118, 348 S.E.2d 374, 378 (Ct. App. 1986)). "However, mere breach of a contract, even if willful or with fraudulent purpose, is not sufficient to entitle a plaintiff to go to the jury on the issue of

punitive damages." *Edens*, 858 F.2d at 202 (citing *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 53, 336 S.E.2d 502, 503 (Ct. App. 1985). "To establish a breach of contract accompanied by a fraudulent act and recover punitive damages, a plaintiff must prove three elements: (1) breach of contract, (2) fraudulent intent relating to the breach, and (3) a fraudulent act accompanying the breach." *Id.*; *Harper*, 290 S.C. at 119, 348 S.E.2d at 378.

As discussed above, Plaintiff's showing does not support a finding of breach of the Agreement, and Plaintiff does not cite to any evidence in the record to substantiate a breach of contract. Without a breach of contract, Plaintiff's claim for breach of contract accompanied by a fraudulent act would also fail under South Carolina law. Summary judgment is granted for Defendant.

**E.**     Count V: Violation of Wage and Hour Act

Plaintiff claims that Defendant violated provisions of the applicable labor laws, whether it be the Wage and Hour Act of North Carolina or South Carolina, by improperly calculating and paying Plaintiff's wages in the form of "accrued vacation, holiday, and sick leave payments, as well as 'incentive payments.'" [Doc. 1-1] at 27. Plaintiff claims that Defendant further deprived Plaintiff of wages due under the applicable labor laws by failing to "repay Plaintiff's accrued vacation, holiday, and sick leave payments . . . as well as Plaintiff's partnership investment funds (the "Operating Partner Payment") . . . due to Plaintiff under the Agreement, employment contract and/or employer policy of Defendant." *Id.*

Defendant argues that Plaintiff was paid everything to which he was entitled, to include all salary, incentive pay, and everything to which he was entitled pursuant to the Mutual Termination Agreement. [Doc. 19] at 22. Defendant supports its argument by citing to the Declaration of Donald Comacho, Defendant's Chief Financial Officer, in the record, in which Mr. Comacho states

that Plaintiff was paid "all compensation he has earned and qualified for pursuant to his Operating Partner Employment Agreement," "his regular salary annualizing to $52,000.00 for the work he performed from September 16, 2014 through September 29, 2014," and "2 additional weeks of pay after he ceased working for [Defendant]." [Doc. 19-24] at 3–4. Defendant also points out that Defendant's vacation policy expressly provides that "[u]nused vacation time or unpaid vacation pay will not be paid upon separation of employment." [Doc. 27] at 7; [Doc. 19-24] at 9.

Because Plaintiff worked at all relevant times for Defendant in Lincolnton, North Carolina, the Court must apply the North Carolina Wage and Hour Act. Defendant cites to the declaration of Donald Comacho, Defendant's Chief Financial Officer, in which he states that Plaintiff was paid everything to which he was entitled. However, Plaintiff does not cite to any evidence in the record to support his assertion that Defendant failed to pay him all of the wages he was owed. The Court views the facts in the light most favorable to Plaintiff, but when Plaintiff doesn't cite to evidence in the record to support his allegations, there is no factual basis to support the claim. Conclusory allegations alone are insufficient. Therefore, summary judgment is granted for Defendant.

**F.**     Count VI: Intentional Infliction of Emotional Distress

Plaintiff claims that Defendant "intentionally or recklessly inflicted severe emotional distress upon Plaintiff, or was certain or substantially certain that such distress would result from [Defendant's] conduct." [Doc. 1-1] at 28. Plaintiff also claims Defendant's conduct was "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal citations omitted). Plaintiff states that his severe emotional distress was a result of "Defendant's breach of contract accompanied by acts of fraud and Defendant's self-serving breach of fiduciary duties/constructive

fraud." *Id.* Defendant argues that neither Plaintiff's "conclusory statements" nor allegations of wrongful termination and deprived wages provide a factual basis sufficient to support Plaintiff's claim for intentional infliction of emotional distress. [Doc. 19] at 23–25.

The Court analyzes Plaintiff's tort claim pursuant to North Carolina law. To succeed on a claim of intentional infliction of emotional distress, Plaintiff must show that (1) Defendant engaged in extreme and outrageous conduct, (2) the conduct was intended to cause Plaintiff severe emotional distress, and (3) the conduct did, in fact, cause Plaintiff severe emotional distress. *See Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992). To be considered "extreme and outrageous" the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 493, 340 S.E.2d 116, 123 (1986) (quoting *Restatement (Second) of Torts* § 46 cmt. (d) (1965)).

"It is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Wilson v. S. Nat. Bank of N. Carolina, Inc.*, 900 F. Supp. 803, 811–12 (W.D.N.C. 1995), *aff'd sub nom. Wilson v. S. Nat. Bank of N. Carolina*, 92 F.3d 1184 (4th Cir. 1996). *See also Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) and *Atkins v. USF Dugan, Inc.,* 106 F.Supp.2d 799 (M.D.N.C.1999). Whether Defendant's conduct "may be reasonably regarded as extreme and outrageous" is a question of law. *Denning-Boyles v. WCES, Inc.*, 123 N.C. App. 409, 412, 473 S.E.2d 38, 41 (1996). "Proof of severe emotional distress does not necessarily require medical evidence or testimony." *Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 450, 579 S.E.2d 505, 508 (2003) (internal quotations omitted) (citing *Coffman v. Roberson,* 153 N.C.App. 618, 627, 628, 571 S.E.2d 255, 261 (2002) (evidence sufficient where

"[plaintiff], her friends, her family, and her pastor testified to the severe emotional distress she suffered and continues to suffer"), *disc. review denied,* 356 N.C. 668, 577 S.E.2d 111 (2003)).

Here, Plaintiff does not cite to any evidence in the record to support his allegation of intentional infliction of emotional distress. In fact, Plaintiff did not attempt to support his allegation in his response brief in opposition to the Motion, and the record doesn't contain any evidence that Plaintiff suffered severe emotion distress. As a result, Plaintiff's claim fails as a matter of law and summary judgment is granted for Defendant.

**G.** Count VII: Punitive Damages

Because the Court grants summary judgment for Defendant as to all of Plaintiff's claims, there is no basis upon which punitive damages could be granted. N.C. GEN. STAT. § 1D-1.

**H.** Count VIII: Action for an Accounting

Plaintiff seeks an Accounting pursuant to N.C. GEN. STAT. § 59-52 (North Carolina Uniform Partnership Act) and S.C. CODE ANN. § 33-41-550 (South Carolina Uniform Partnership Act) for the incentive payments due and for the return of his Operating Partner Payment under the terms of the Agreement. [Doc. 1-1] at 29–30. Plaintiff states that the Agreement was "an attempt by Defendant to secure the Plaintiff's investment by calling him a 'Partner' and promising (profit-sharing) 'incentive payments' over a five-year joint venture." [Doc. 23-2] at 24. Defendant argues that no legal partnership existed between Plaintiff and Defendant, and points out that the Agreement expressly provides that Plaintiff does not have an ownership interest. [Doc. 19] at 25. Section 4(f) of the Agreement provides that "the Operating Partner hereby acknowledges that the Incentive Amount . . . does not constitute an ownership interest of any kind in the Corporation or any specific assets of the Corporation." [Doc. 19-1] at 5.

Because Plaintiff was employed by Defendant in Lincolnton, North Carolina at all relevant times, the Court must apply North Carolina law. Pursuant to N.C. GEN. STAT. § 59-52, a partner may seek an accounting "if he is wrongfully excluded from the partnership business or possession of its property by his copartners." Here, the Agreement clearly and expressly provides that Plaintiff is not in a partnership with Defendant and has no ownership interest. As a matter of law, Plaintiff cannot prevail in an attempt to force an accounting for a partnership that doesn't exist.

**I.**      Count IX: Declaratory Judgment

Because the Court grants summary judgment for Defendant as to all of Plaintiff's claims, there is no basis upon which declaratory relief could be granted. N.C. GEN. STAT. § 1-254.

**IT IS, THEREFORE, ORDERED THAT** Defendant is **GRANTED** Summary Judgment on all Counts.

Signed: November 21, 2016

Richard L. Voorhees
United States District Judge